IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

STEPHANIE WRIGHT,                    )
                                     )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      CIVIL ACTION NO. 5:19-CV-386 (MTT)
                                     )
GEORGIA DEPARTMENT OF                )
PUBLIC HEALTH, *et al.*,             )
                                     )
                                     )
            Defendants.              )
_____     )

## ORDER

Defendants Georgia Department of Public Health ("Department") and Marsha

Stone have moved for summary judgment on all claims.  For the reasons stated below,

that motion (Doc. 24) is **GRANTED**.

## I. BACKGROUND[1]

Stephanie Wright, an African American female, was employed with the

Department as a Training and Development Specialist in the North Central Health

District.  Docs. 24-2 ¶ 1; 31-1 ¶ 1.  Her responsibilities included planning and

coordinating training sessions for the North Central Health District; performing learning

and development training; and creating, implementing, and improving the Workforce

Development Plan.  Docs. 24-2 ¶ 2; 31-1 ¶ 2.  In her last year of employment at the

Department, Wright had several direct supervisors.  Wright reported to Marsha Stone,

---

[1] Unless otherwise stated, the facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

the District Human Resources Director, from February 1, 2017 to June 30, 2017.  Docs. 24-2 ¶ 7; 31-1 ¶ 7.  From July 1 to September 17, Wright reported to Teresa McDaniel, the District Administrator.  Docs. 24-2 ¶ 7; 31-1 ¶ 7.  Finally, from September 20 to January 12, 2018, Wright reported to Sylvia Woodford, the District Financial Administrator.  Docs. 24-2 ¶ 7; 31-1 ¶ 7.  Stone and McDaniel are Caucasian; Woodford is African American.  Docs. 24-2 ¶ 7; 31-1 ¶ 7.

The defendants argue that Wright's job performance and professionalism became issues in 2017; Wright disagrees.  According to the defendants, Wright met with McDaniel, her supervisor at the time, on July 31, 2017 to discuss job performance deficiencies and unprofessional conduct.  Doc. 24-2 ¶ 15 (citing Doc. 24-4 ¶ 6).  The defendants also state that in this meeting McDaniel assigned Wright various tasks, such as tracking her relationship building with the various district managers, creating a list of all training sessions and indicating which sessions were required, and updating the managers on what training needed to be done.  *Id*.  Wright does not recall this meeting, and while Wright says she and McDaniel did speak at some point, she contends it was primarily about the good feedback she was receiving.  Doc. 26 at 70:4-71:24.

On September 21, 2017, Woodford and McDaniel, Wright's current and former supervisors, respectively, met with Wright, and Wright was issued a written reprimand and a 30-day work plan.  Docs. 24-2 ¶ 16; 31-1 ¶ 16.  Wright's eight-part work plan stated:

> (1) You are required to submit monthly updates no later than the 10th of each month.  (2) You are to submit a proposal to revamp orientation and discuss plan with your supervisor.  (3) You are to create a proposed plan for employee in-service training and discuss with your supervisor.  (4) You are to work on enhancing customer service from you to our employees. (5) You are to build relationships with managers in the district and give

them updates.  (6) You are to create a list of all trainings offered separated by required, recommended, and optional and how often they are offered, and submit to your supervisor.  (7) You are to begin informing managers with updates where they stand with trainings for their staff and offer your guidance to get them on tract.  (8) You are to create a list of your job duties and submit to your supervisor.

Docs. 26-4; 26 at 50:13-53:14.

While Wright admits that she was reprimanded and that she was given a 30-day work plan, she denies that there were any issues with her work performance.  Doc. 31-1 ¶ 16.  Specifically, Wright says she had received a positive annual review earlier that month.  *Id*. ¶ 15 (citing Doc. 28-14 at 2).  Wright also testified that after she received the reprimand and work plan, Woodford told her that they "would just move forward because the write-up was not correct."  Doc. 26 at 56:2-3.  In some places, Wright suggests that she believes Stone directed Woodford and McDaniel to issue the reprimand and the 30-day work plan because Wright, during a meeting, shared survey results unfavorable to Stone.  Docs. 31 at 2; 31-2 ¶¶ 5-7.  However, the only evidence Wright cites to support this theory are the allegations in her complaint,[2] the defendants' denial of those allegations in their answer, and her own testimony that *Woodford* issued her the reprimand.

Wright responded to the reprimand and the 30-day work plan with a written statement that she emailed at 4:55 p.m. on September 28, 2017 to Stone, McDaniel, Woodford, and Dr. Olugbenga Obasanjo, an African American male who had been appointed interim medical director of the North Central Health District in mid-2017.

---

[2] In many places, Wright cites her complaint as factual support.  If a plaintiff's complaint is verified, the factual statements in it are given the same weight as those in an affidavit.  *Stallworth v. Tyson*, 578 F. App'x 948, 950 (11th Cir. 2011).  Wright's complaint, however, is not verified.  *See* Doc. 1.

Docs. 26-8; 24-7 at 16-18; 26 at 85:5-21.[3]  The majority of this response focused on Wright's version of her work performance, including her contention that she had already been completing the requirements of the 30-day work plan.  Doc. 24-7 at 16-18.  Wright concluded her response by stating: "I feel that I have been targeted, threatened, and the work environment has not always been favorable."  Doc. 24-7 at 18.  Wright makes no mention of racial issues in her response.  Woodford replied by email to Wright's response on October 5, 2017, saying, "[t]hanks for sharing your response to the written reprimand presented September 21, 2017.  Going forward we will continue to focus on your developmental work plan and meet again in 30 days as committed."  Doc. 26-8.  It appears that Wright and Woodford did meet sometime in late October, and the two discussed Wright's job duties.  Doc. 26 at 57:23-59:23.

According to Wright, on September 27, 2017, the day she sent the response to her reprimand, Wright and her co-workers were moving their offices to another part of the same building.  Docs. 1 ¶¶ 18-21; 26 at 116:1-4; 26-11.  Wright claims that Stone would not allow her to move her furniture into her new office but that two white female employees were allowed to move their furniture.  Docs. 1 ¶¶ 18-20; 26 at 156:19-157:11.

Wright alleges that on September 28 she submitted an Intake Questionnaire to the Equal Employment Opportunity Commission.  Docs. 1 ¶ 18; 31 at 2.  Wright also alleges that the EEOC issued a Notice of Charge of Discrimination to the Department

---

[3] It is perhaps worth noting that although Stone and Dr. Obasanjo were copied on Wright's response, the response was only addressed to Woodford and McDaniel.  Stone is mentioned only once, and then only as background to explain that Wright's supervisor had constantly changed in the preceding months.  Doc. 24-7 at 16-17.

on October 3, 2017.[4]  Docs. 31 at 2; 1 at ¶ 25.  Wright's Charge was submitted to the

EEOC on December 4, 2017, and it was stamped as "received" by the Department on

February 9, 2018.  Doc. 28-2.

Dr. Obasanjo, who previously had served as health director in another district,

was responsible for all medical decisions, possessed the hiring and firing authority as

the administrative head of the district, and served as CEO of county boards of health in

the district.  Docs. 27 at 22:16-23, 23:3-24:6, 24:7-19; 24-2 ¶ 9; 31-1 at ¶ 9.  Dr.

Obasanjo felt strongly about a concept called "Public Health 3.0," and his goal was to

move the North Central Health District toward the Public Health 3.0 model, as he had

done in his former district.  Docs. 24-2 ¶¶ 11-12; 31-1 ¶¶ 11-12; 27 at 33:10-40:3.  Dr.

Obasanjo testified that "the five pillars of public health 3.0 [are] staff training, leadership,

non-traditional sources and uses of data, structural reorganization … and strategic

partnerships."  Docs. 27 at 37:8-14; 24-2 ¶ 12; 31-1 ¶ 12.  Dr. Obasanjo felt that staff

training was the most important pilar of Public Health 3.0.  Doc. 27 at 39:22-25.

The defendants state that on January 10, 2018, Dr. Obasanjo, Stone, and

Woodford met to discuss changes that Dr. Obasanjo envisioned for transitioning to a

Public Health 3.0 model.  Docs. 24-2 ¶ 29; 24-6 ¶ 15; 24-5 ¶ 8; 24-7 ¶ 19.  According to

the defendants, one of these changes included transforming the Training and

Development Specialist position, then held by Wright, to a Training Manager position.

Doc. 24-2 ¶ 29.  In some instances, Wright appears to dispute that this meeting took

place.  She claims Stone did not understand Public Health 3.0 and thus it is

---

[4] Wright cites only allegations in the complaint to support her claims that she filed an Intake Questionnaire and that the EEOC issued a Notice of Charge to the Department.  While the defendants concede that Wright did fax an Intake Questionnaire to the EEOC, the defendants do not concede—and there is no evidence—that they were aware Wright had done so.  Doc. 33-1 ¶ 18.

"improbable" that she spoke with Dr. Obasanjo to discuss a restructure based on that model's needs.  Doc. 31-1 ¶ 29.  But in her response brief, Wright concedes that the January 10 meeting took place and alleges, to support her cat's paw argument, that Stone "chimed-in" and told Dr. Obasanjo that "she had tried to talk with Ms. Wright about Dr. Obasanjo's new Public Health 3.0 direction, but she had failed to come up with a plan."  Doc. 31 at 3 (citing Doc. 28 at 55:5-15).[5]

Wright's employment was terminated January 12, 2018, and she filed a second EEOC charge on January 16, 2018.  Docs. 1 ¶ 34; 7 ¶ 34; 26-13.  After Wright's employment ended, the Department posted a job announcement for the newly created Training Manager position.  Doc. 24-7.  Interviews were had, and Chrystal Morgan, a Caucasian female, was selected for the position because she received the highest interview scores.  Docs. 24-2 ¶ 42; 31-1 ¶ 42.[6]  Wright subsequently received her Right to Sue Letter and sued Stone and the Department for racial discrimination and retaliation.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[5] This cited excerpt from Stone's deposition states in its entirety:
> Q: Tell me what happened, if you remember.
> A: Dr. O – I mean he had been telling us for a while, you know, that we were moving in a different direction with training and I had expressed that to [Wright] and her other supervisors had, you know, expressed that to her and asked her for a plan and I don't believe she ever came up with a plan for that.  So, he decided that he wanted to move in a different direction with that – you know, find somebody who was on board with that, I think.

[6] Wright disputes this fact, but it appears that Wright is arguing that she was more qualified than Morgan, not disputing that Morgan was hired as the Training Manager or that Morgan received the highest interview scores.  Doc. 31-1 ¶ 42.

matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on

the evidence presented, "'a reasonable jury could return a verdict for the nonmoving

party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir.

2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th

Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant

may support its assertion that a fact is undisputed by "citing to particular parts of

materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of

the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P.

56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving

party is not required to 'support its motion with affidavits or other similar material

*negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four

Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to

the district court—that there is an absence of evidence to support the nonmoving party's

case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the

movant may provide "affirmative evidence demonstrating that the nonmoving party will

be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's

showing "by producing … relevant and admissible evidence beyond the pleadings."

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011)

(citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if

the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed

fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. Title VII Retaliation[7]

Wright claims that the Department and Stone retaliated against her by terminating her employment on January 12, 2018.  Doc. 1 ¶ 48-66.  Under Title VII, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

### 1.  Standard

A Title VII or § 1981 plaintiff may prove her case circumstantially when there is no direct evidence of retaliation.  When, as here, a retaliation claim is based on circumstantial evidence, the Court applies the *McDonnell Douglas* burden-shifting framework.  *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Pursuant to *McDonnell*

---

[7] The Court's analysis of Wright's Title VII retaliation claim also applies to her § 1981 retaliation claim. Doc. 1 ¶¶ 59-66; *see Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008); *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009).

*Douglas*, a plaintiff must first establish a prima facie case of retaliation.  If a plaintiff establishes that prima facie case, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff.  *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (quotation marks and citation omitted).

A plaintiff then has the opportunity to show that the employer's stated reason is a pretext for discrimination.  This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256.  "If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer."  *Kragor*, 702 F.3d at 1309.  But, if a plaintiff cannot offer "sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1024-25 (11th Cir. 2000).

### 2. Prima Facie Case

"[T]he *prima facie* case for retaliation requires the employee to show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment

action; and (3) she established a causal link between the protected activity and the adverse action." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181-82 (11th Cir. 2010) (citation omitted).

Wright alleges that she engaged in a protected activity when, in her response to a written reprimand, she complained that she felt targeted, threatened, and subjected to an unfavorable work environment. Docs. 1 ¶ 51; 24-7 at 16-18. Wright also alleges that she engaged in protected activities when she submitted an Intake Questionnaire to the EEOC on September 28, 2017 and when she submitted her EEOC Charge of Discrimination on December 4, 2017. Doc. 1 ¶¶ 52-53. The defendants do not dispute that these are protected activities. Wright alleges, and the defendants do not dispute, that she suffered an adverse employment action when her employment was terminated on January 12, 2018.[8] Docs. 1 ¶ 57; 24-1 at 12-13. Thus, the first two elements of Wright's prima facie case are not disputed. *See* Doc. 24-1 at 12.

The defendants argue, however, that Wright cannot establish a causal connection between her protected activities and the adverse employment action taken against her. *Id*. To establish a causal connection, Wright must show that (1) the decisionmaker knew of her protected activity and (2) the protected activity and adverse

---

[8] Wright mentions the furniture-moving incident in the retaliation section of her response brief. Doc. 31 at 8. Wright states that this incident happened on September 27, 2017, and she appears to imply that Stone was retaliating against her because of the response to her reprimand that she emailed her supervisors that same day. The defendants argue that Wright distributed her response at the end of the business day on September 27—implying that the furniture-moving incident must have been before the complaint was sent and thus it could not be retaliatory. Doc. 33 at 5 n.3. But the Court need not decide this issue because the only adverse employment action Wright alleged in her complaint was her termination. Doc. 1 ¶ 57. Moreover, contrary to what Wright argues in her brief, Wright's response to her reprimand barely mentioned Stone, and it certainly did not state that Stone targeted her or treated her unfairly. Doc. 24-7 at 16-17. Further still, Wright cites no evidence supporting her statements concerning the furniture-moving incident. Finally, in arguing that she has established a prima facie case, Wright cites only to her termination and its temporal proximity to her EEOC Charge. Doc. 31 at 9. Therefore, the only adverse employment action that the Court will address is the termination of Wright's employment.

action were not wholly unrelated.[9]  *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).  Wright appears to rely only on temporal proximity to show a causal connection between her EEOC Charge and the termination of her employment. Temporal proximity may be used to establish the relatedness between the protected activity and the adverse action, but it must be very close when it is the only evidence of causation.  *Redd v. United Parcel Service, Inc.*, 615 F. App'x 598, 606 (11th Cir. 2015) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).

The defendants produced sworn statements from Stone, Woodford, and Dr. Obasanjo that they were unaware Wright had filed a Charge before the decision to terminate Wright was made on January 10, 2018.  Docs. 28 at 38-39; 24-5 ¶ 10; 24-7 ¶ 21; 24-6 ¶ 21.  Consistent with this, the Charge was stamped "received" by the

---

[9] In *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, The Supreme Court held that the plaintiff's ultimate burden requires a showing of but-for causation.  570 U.S. 338, 360 (2013).  Courts disagree on whether *Nassar*'s but-for causation standard applies only to the ultimate burden, or also to the causation element of the *McDonnell Douglas* prima facie case.  *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250-51, 51 n.10 (4th Cir. 2015) (noting circuit split and citing cases).  The Eleventh Circuit has not taken a position on the issue, though unpublished decisions have extended the but-for causation requirement to the prima facie case.  *See Callahan v. City of Jacksonville*, 805 F. App'x 749, 752-53 (11th Cir. 2020); *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 778–79 (11th Cir. 2014); *Butterworth v. Lab. Corp. of Am. Holdings*, 581 F. App'x 813, 817 (11th Cir. 2014).

However, in published guidance, the Eleventh Circuit has clearly stated that the plaintiff's ultimate burden and the plaintiff's prima facie case are different.  *See Simmons v. Camden Cnty. Bd. Of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985) ("the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action … would rise to the level of direct evidence of discrimination.").  *McDonnell Douglas* is a framework for proving discrimination indirectly, and a showing of but-for causation would, in practice, often require direct evidence.  Further, courts have continued to analyze causation using the lighter burden of *Simmons*.  For example, the rule that temporal proximity between the protected activity and the adverse action can satisfy causation remains unchanged.  *See, e.g.*, *Callahan*, 805 F. App'x at 753 ("Causation [for purposes of the prima facie case] may be inferred by 'close temporal proximity between the statutorily protected activity and the adverse employment action'").  Of course, that showing of mere proximity, by itself, would rarely be enough to sustain a verdict for the plaintiff finding but-for causation.  Clearly, the required showing of causation in the *McDonnell Douglas* prima facie case is a lighter burden than that required at trial.  And even courts phrasing the prima facie case in terms of "but-for" causation cannot realistically evaluate whether discrimination was a but-for cause of the adverse action until they hear the defendants' argument about causation (the proffered "legitimate, non-discriminatory reason" for the adverse action) and hear the plaintiff's rebuttal to that argument (the pretext showing).  In lieu of binding precedent extending *Nassar* to the prima facie case, therefore, the Court continues to apply *Simmons*.

Department on February 9, 2018—nearly a month after Wright was terminated.  Doc. 28-2.  Wright, however, argues that there is at least a question of fact as to whether they knew about the Charge earlier.  Doc. 31 at 8 (citing Doc. 31-1 ¶¶ 36, 45).  She points to Dr. Obasanjo's testimony that EEOC Charges were typically handled by the Human Resources Director (Stone), who would then bring Charges to his attention.  Doc. 27 at 29:16-30:20.  Moreover, Stone stated that the Human Resources department kept a log of employee disciplinary actions and tracked whether these actions resulted in an EEOC Charge being filed.  Doc. 28 at 62:19-64:3.  This log reflects Wright's Charge in response to her September 21, 2017 written reprimand but does not reveal when the Charge was documented in the log.  Doc. 28-11 at 3.  Stone further testified that she had access to this log and referred to it from time to time.  Doc. 28 at 64:20-65:2.  Other than the log, which again does not indicate when the Department received the Charge, Wright points to no evidence that the defendants were aware of Wright's December 4 Charge.

In short, there is no evidence that the defendants were aware Wright had filed an EEOC Charge before the January 10 meeting.  Thus, Wright has not established a prima facie case of retaliation.

### 3. Legitimate, Non-Discriminatory Reason

Even if Wright had established a prima facie case of retaliation, she has not rebutted the defendants' legitimate, non-discriminatory reason for her termination.  The defendants state that Dr. Obasanjo desired to move the Department toward a Public Health 3.0 model.  Doc. 24-1 at 14.  This transition required "a leader who could develop and implement a strategic workforce policy and develop training to comport

with that policy." *Id*. (citing Docs. 24-6 ¶ 15; 24-5 ¶ 8; 24-7 ¶ 19).  The defendants state

that in the January 10, 2018 meeting, Dr. Obasanjo, Stone, and Woodford discussed

Wright's lack of leadership and motivation, her failure to submit a draft proposal for an

in-service training program, and her failure to complete her 30-day work plan.  Docs. 24-

1 at 14; 33 at 8; 24-6 ¶¶ 14-18; 24-5 ¶ 8; 24-7 ¶¶ 18-19.  Dr. Obasanjo believed that

"Wright did not have the skill set, motivation, or leadership to fulfill the new direction [he]

envisioned for the Workforce Development Program, which included upgrading the

Training & Development Specialist to a Training Manager position.  In addition, [he] did

not feel that there was a role for Ms. Wright in the restructured Workforce Development

team."  Doc. 24-6 ¶ 17.  Dr. Obasanjo then "decided that Ms. Wright's employment

would be terminated as of January 12, 2018."  *Id*. ¶ 18.  Woodford, Stone, and Dr.

Obasanjo all state that this is this is reason Wright was terminated.  Docs. 24-7 ¶ 19;

24-5 ¶ 8-9; 24-6 ¶¶ 15-18.  Accordingly, the defendants have met their burden of

production, and Wright must rebut the defendants' proffered reason.

To show that the defendants' given reason was pretextual, Wright argues that the

defendants' witnesses lack credibility.  The bulk of Wright's argument focuses on

Stone's testimony that Stone did not understand Public Health 3.0.  *See* Doc. 28 at

25:11-16.  From that statement, Wright argues that Stone could not have legitimately

contributed to the January 10 meeting with Dr. Obasanjo and Woodford concerning

Wright's ability to move toward the Public Health 3.0 model.  Doc. 31 at 9-10.  However,

the defendants' stated reason for terminating Wright is not brought into question simply

because Stone did not understand Public Health 3.0.  Without understanding Public

Health 3.0, Stone could still advise Dr. Obasanjo about Wright's leadership qualities,

motivation, and job performance—factors Dr. Obasanjo states he considered when he terminated Wright's employment.  Doc. 24-6 ¶¶ 15-17.  Because staff training was crucially important to Public Health 3.0, Dr. Obasanjo wanted to restructure training in the North Central Health District and transform Wright's position into a supervisory position.  Docs. 24-1 at 14; 24-6 at ¶ 17; 27 at 38:7-11.  Stone also would not need a perfect understanding of Public Health 3.0 to contribute to a discussion about whether a given employee displayed the skills necessary to move into a supervisory position.  Accordingly, Wright has not rebutted the defendants' proffered reason by pointing out that Stone did not fully understand Public Health 3.0.

Perhaps Wright meant to argue that Dr. Obasanjo's testimony is untrustworthy.[10] In an affidavit, Dr. Obasanjo stated that he believed that "Wright did not have the skill set, motivation, or leadership to fulfill the new direction [he] envisioned for the Workforce Development Program, which included upgrading the Training & Development Specialist position to a Training Manager position."  Doc. 24-6 ¶¶ 16-17.  However, Dr. Obasanjo stated in his deposition that nothing in particular stood out in his memory about Wright's employment.[11]  But later in his deposition, when asked a more specific question, Dr. Obasanjo testified there were complaints about Wright's work performance from her supervisors.  Doc. 27 at 75:3-7.  Therefore, Dr. Obasanjo's testimony does not contradict the defendants' proffered reason.  On the contrary, because he desired to

---

[10] Wright mentions Dr. Obasanjo's testimony in her response to the defendants' statement of undisputed material facts, but she does not argue that it is evidence of pretext in her brief.  Doc. 31-1 ¶¶ 28-29, 31.

[11] Wright cites the following testimony:
> Q: Yeah, let me rephrase that question.  Is there anything about Ms. Wright's employment that stands out in your memory?
> A: Not particularly.

Doc. 31-1 ¶ 29 (citing Doc. 27 at 86:4-88:5).

transform the training position into a supervisory role, the fact that nothing stood out in his memory about Wright's employment could support his opinion that she lacked the "skill set, motivation, or leadership to fulfil the new direction [he] envisioned[.]"  Doc. 24-6 ¶ 17.  Thus, even if she had made this argument, Wright still would not have presented sufficient evidence to demonstrate that the defendants' proffered reason is unworthy of credence.

### 4. Cat's Paw

Wright also has not created a fact issue about whether Stone, as opposed to Dr. Obasanjo, made the decision to terminate her employment.  *See* Docs. 24-6 ¶¶ 15-19; 27 at 23:7-19, 86:24-87:1; 28 at 20:10-19, 23:6-9.  Though not exactly clear from her brief, Wright appears to argue that Dr. Obasanjo acted as a mere "cat's paw" for Stone's retaliatory animus.  Under a cat's paw theory, an employer can be held liable "only if the subordinate supervisor (1) performs an act motivated by [retaliatory] animus that is intended to cause an adverse employment action, and (2) that act is a *proximate cause* of the ultimate employment action."[12]  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 (11th Cir. 2013) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 423 (2011)) (emphasis added).  Here, even if Stone harbored retaliatory animus toward Wright, Wright has pointed to no evidence supporting her assertion that Stone persuaded Dr. Obasanjo to terminate her employment.  Wright makes this claim twice in her brief and once in her statement of disputed material facts.  Docs. 31 at 3, 10; 31-2 at ¶ 25.  But in her brief, Wright merely

---

[12] The Eleventh Circuit has recently clarified that in a cat's paw case, a district court should "apply the operative causation standard—whatever it may be—to the actions of the lower-level employee."  *Ziyadat v. Diamondback Hospitality Co.*, ___ F.4th ___, 2021 WL 2934695, at *5 (11th Cir. July 13, 2021). But, for the reasons explained, Wright cannot establish a cat's paw theory of liability even under the more lenient but-for causation standard.

cites the allegations in her complaint to support this claim; she does not point to any evidence tending to show that Stone convinced or persuaded Dr. Obasanjo to terminate her employment or, as she puts it, that "Dr. Obasanjo apparently just took Defendant Stone's word about Ms. Wright and decided to terminate her."  Doc. 31 at 10.

In her statement of disputed material facts, Wright again states that "[a]fter Defendant Stone reviewed the Charge of Discrimination, naming her as the individual responsible for the discrimination, she recommended to Dr. Obasanjo that he terminate Ms. Wright."  Doc. 31-2 ¶ 22.  Other than the pleadings, Wright cites three deposition excerpts that she contends support this conclusion, none of which do.  One excerpt restates the defendants' proffered reason for Wright's termination (Doc. 28 at 55:5-15); another merely establishes that Stone, the Human Resources Director, sometimes provided Dr. Obasanjo, the District Health Director, with her opinion on personnel matters and that Dr. Obasanjo depended on those opinions (Doc. 27 at 42:23-43:19); and the third, Wright's deposition, merely states Wright's theory of the case: "It's my thought that she told him that" (Doc. 26 at 187:23-188:10).  Immediately after stating this theory in her deposition, Wright admits that she does not have any personal knowledge that Stone recommended to Dr. Obasanjo that her employment be terminated.  Doc. 26 at 188:14-20.  Also, in response to the defendants' statement of material facts, Wright attempts to support her theory by stating that Stone did not allow her to speak with Dr. Obasanjo *after* her employment was terminated but that Dr. Obasanjo would have spoken with her.  Doc. 31-1 ¶ 32.  This fact does not show that Stone had previously caused or persuaded Dr. Obasanjo to terminate Wright's employment.  In short, Wright has not produced even a scintilla of evidence that Stone

caused or persuaded Dr. Obasanjo to terminate Wright's employment or even that Stone made such a recommendation to Dr. Obasanjo.

Accordingly, because Wright has not come forward with evidence that the defendants' proffered reason for terminating her employment is unworthy of credence or that Stone persuaded Dr. Obasanjo to terminate Wright's employment, the defendants are entitled to summary judgment on Wright's retaliation claims.[13]

## B. Race Discrimination Claims

Wright asserts a race discrimination claim again Stone pursuant to 42 U.S.C. § 1983 and race discrimination claims against Stone and the Department pursuant to 42 U.S.C. § 1981.[14]   Docs. 1 ¶¶ 59-72; 31 at 4.   The Eleventh Circuit has held that a race discrimination claim against a state actor cannot proceed based solely on § 1981.   *Butts v. County of Volusia*, 222 F.3d 891, 894-95 (11th Cir. 2000).   Rather, § 1981 claims against state actors may only be brought pursuant to 42 U.S.C. § 1983.   *Id*. Accordingly, the claims against Stone, a state actor, are merged under the § 1983 claim.

### 1.   The claim against the Department

---

[13] The Court recognizes that "establishing the elements of the *McDonnell Douglas* framework is not … the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).   A plaintiff can always survive summary judgment by creating a triable issue concerning the employer's discriminatory intent.   A plaintiff does this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"   *Id*. (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).   Wright does not raise a convincing mosaic argument, and even if she had, her facts and arguments nonetheless would fail to create such a convincing mosaic.

[14] Under Section 1981, "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens," which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."   42 U.S.C. § 1981(a)-(b).

The Department correctly argues that it is insulated from Wright's § 1981 claim by Eleventh Amendment immunity; Wright does not counter this argument.

The Eleventh Amendment protects a state or an arm of the state from being sued in federal court without the state's consent.  *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003).  Congress may abrogate this immunity, however, if it (1) makes its intention unmistakably clear in the language of the statute, *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)); and (2) the waiver is "a valid exercise of power."  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996).  A state may also consent to being sued and thereby waive its Eleventh Amendment immunity.  *Williams v. Bd. of Regents of Univ. of Ga.*, 477 F.3d 1282, 1301 (11th Cir. 2007) (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239-40 (1985)).

Congress has not abrogated the states' Eleventh Amendment immunity from § 1981 claims, and the state of Georgia has not consented to being sued pursuant to § 1981.  *Alyshah v. Georgia*, 239 F. App'x 473, 474 (11th Cir. 2007).  The Department is a "department and political subdivision of the State of Georgia" and is therefore an arm of the state.  Docs. 1 ¶ 4; 7 ¶ 4; O.C.G.A. § 31-2A-2.  Therefore, Eleventh Amendment immunity applies to the claims asserted against the Department pursuant to § 1981.  Accordingly, the defendants' motion for summary judgment as to Wright's § 1981 claim against the Department is **GRANTED**.[15]

    *2.  The claim against Stone*

---

[15] This result would not change if Wright had brought her race discrimination claim against the Department pursuant to § 1983.  *Williams*, 477 F.3d at 1301-02.

The only remaining claim is Wright's § 1981 intentional race discrimination claim brought against Stone pursuant to § 1983.  Doc. 1 ¶¶ 59-72.  Wright does not specify the grounds for her race discrimination claim, but it appears to be based solely on the termination of her employment.  As discussed, at times Wright mentions the furniture moving incident and Stone's reaction to Wright's disclosure of survey results, but Wright cites no record evidence when she mentions these events.  Docs. 31-2 ¶¶ 6, 12-14; 31 at 2.  Moreover, she does not discuss these events at all in the race discrimination section of her brief.  But Wright does cite facts concerning her termination and who replaced her, and she vaguely mentions that there are comparators who were not terminated.  Doc. 31 at 11.  Wright also lists the elements that she must establish to make out a prima facie case arising from an adverse employment action based on her race.  *Id.* (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011)).  Accordingly, the few sentences in her brief devoted to arguing that her race discrimination claim can survive summary judgment can only be interpreted as asserting a claim based on her termination, and that is the only basis for a race discrimination claim the Court addresses.[16]

   a.  Standard

Race discrimination claims brought pursuant to 42 U.S.C. §§ 1981 and 1983 have the same elements of proof and are analyzed under the same framework as claims brought under Title VII.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318 (11th Cir. 1998); *Brown v. Ala. Dept. of Transp.*, 597 F.3d 1160, 1174 n.6 (11th Cir. 2010).

---

[16] "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

Wright does not rely on direct evidence to prove her race discrimination claim, so the Court evaluates her claim under the *McDonnell Douglas* framework, which has been explained in the retaliation portion of this Order.

        b.  Prima Facie Case

To establish a prime facia case for a race discrimination claim, a plaintiff must show that "(1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or was treated less favorable than a similarly situated individual outside [her] protected class." *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

The defendants argue that Wright cannot satisfy the last prong of the prima facie case. Doc. 24-1 at 19. Wright responds that she can satisfy the last prong in two ways. First, Wright states that she can establish a prima facie case by pointing to evidence that she was treated less favorably than similarly situated Caucasian employees. Doc. 31 at 11. "[A] plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019) (quotation marks omitted). Confusingly, however, Wright supports her comparator theory by citing one of her responses to the defendants' statement of undisputed facts, specifically a response where Wright denies that she has identified comparators. Doc. 31 at 11 (citing Doc. 31-1 at ¶ 47). In that response, Wright disputes the defendants' assertion that she has identified two comparators that were treated more favorable than her, and she responds that she "was neither asked, nor did she

identify 'comparators,' as suggested by Defendants."   Doc. 31-1 at ¶ 47.   Other than this damaging admission and one conclusory sentence in her brief, Wright does not attempt to satisfy her prima facie case by pointing to comparators.   Accordingly, Wright has not carried her burden of establishing that there were comparators—much less similarly situated comparators.

Wright also attempts to satisfy her prima facie case by arguing that although her position was technically eliminated, her "job duties were nearly identical than [sic] those of the position that [the Department] purportedly created," and a person outside of her protected class filled that position.   Doc. 31 at 11.   The defendants do concede that a Caucasian female was hired for the Training Manager position, but they argue that the two positions differ because the new Training Manager position was a supervisory position, while the eliminated Training and Development Specialist position was not. Docs. 24-2 ¶¶ 42-43; 33 at 9-10.   Therefore, the defendants argue, Wright was not "replaced" by anyone.   However, some of Wright's job duties were assigned to the new position, and that position was filled by someone outside of Wright's protected class. Docs. 24-4 at 6; 24-6 at 12.   Thus, arguably, a reasonable jury could conclude that Wright has satisfied the last prong of her prima facie case.   *See Lawson v. Plantation General Hosp. L.P.*, 704 F. Supp. 2d 1254, 1284 (S.D. Fla. 2010); *Miller v. Aramark Corp.*, 2004 WL 1781103 at *4 (N.D. Ga. July 14, 2004).

c.   Legitimate, Non-Discriminatory Reason

Although Wright has arguably made out a prima facie case, her race discrimination claim against Stone nonetheless fails for two reasons.   First, Wright has not rebutted the defendants' proffered reason for terminating her employment.   As

stated above, Dr. Obasanjo stated that "Wright did not have the skill set, motivation, or leadership to fulfill the new direction [he] envisioned for the Workforce Development Program, which included upgrading the Training & Development Specialist to a Training Manager position.  In addition, [Dr. Obasanjo] did not feel that there was a role for Ms. Wright in the restructured Workforce Development team."  Doc. 24-6 ¶ 17.  In the race discrimination section of her brief, Wright does not point to any new evidence or make any new arguments that the defendants' proffered reason for terminating her employment is unworthy of credence.  Wright does emphasize, for some reason, that under the *McDonnell Douglas* framework, "the ultimate burden of persuading the tried [sic] of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Doc. 31 at 12 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993)).  Wright's defendant-friendly statement is correct, and to survive summary judgment Wright must come forward with some evidence that the defendants' proffered reason for terminating her employment is unworthy of credence.  Wright has failed to do so, and thus the defendants' motion for summary judgment should be granted.

Moreover, as mentioned in the retaliation section of this Order, Wright has not created a fact issue about whether Stone caused Dr. Obasanjo to terminate her employment or that Stone was the real decisionmaker.  Therefore, Wright's race discrimination claim against Stone, which is based on the same adverse employment action as Wright's retaliation claim, cannot succeed.  Wright has not pointed to any evidence that could establish that Stone caused the termination of Wright's employment, or even that Stone made such a recommendation.

In sum, Wright has failed to come forward with evidence that would allow a jury to reasonably conclude that the defendants' proffered reason for terminating her employment was unworthy of credence.  Further, Wright has failed to show that Stone persuaded Dr. Obasanjo to terminate her employment or that Stone was the real decisionmaker.  Accordingly, the defendants are entitled to summary judgment on Wright's race discrimination claim.

## IV. CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment (Doc. 24) is **GRANTED**.

**SO ORDERED**, this 11th day of August, 2021.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT